OPINION *Page 2 
{¶ 1} Appellant Kelli Church ("Mother") appeals the May 9, 2007 Judgment Entry entered by the Licking County Court of Common Pleas, Juvenile Division, which terminated Mother's parental rights, privileges, and responsibilities with respect to her minor son, and granted permanent custody of the child to appellee Licking County Department of Job and Family Services ("the Department").
 STATEMENT OF THE FACTS AND CASE {¶ 2} On October 4, 2004, the Department received a referral of neglect of Cody Church (DOB 2/17/02) by Mother and Brett Church ("Father"), the child's biological father.[1] Father and Mother separated some time in 2002, but, at the time of the referral, were not divorced. In June, 2004, Mother moved to Las Vegas, Nevada, with Roy Howell, Mother's paramour, and her daughter, Kaylee. Mother did not bring Cody and her other son, Austin, with her at that time. Instead, Mother left Cody and Austin in the care of Father and the boys' paternal grandmother. In August, 2004, Mother requested Cody and Austin be returned to her. The boys' paternal grandmother flew the children to Las Vegas, and returned them to Mother.
 {¶ 3} In early September, 2004, Howell returned to Newark, Ohio, for a court hearing, and brought Cody with him. Howell took Cody to his paternal grandmother's home without notifying anyone in the family he was returning to Ohio, and he was returning Cody to them. Howell informed the Church family Mother was pregnant and unable to care for Cody. Because Howell was flying back to Ohio, and the two year old *Page 3 
child was able to fly for free, Mother decided to send Cody with Howell. Howell did not provide Father or the paternal grandmother with clothing, diapers, or food for Cody. When Cody arrived at his paternal grandmother's home, the child was wearing a diaper and a t-shirt, and had puss draining from his ear to such a degree his grandmother and Father took him immediately to the emergency room. The doctor discovered Cody had a severe ear infection and advised the family he was surprised Cody's eardrum had not ruptured during the flight. Cody also had a diaper rash which was so severe his bottom was bleeding.
 {¶ 4} Father was homeless at the time of Cody's arrival. He made arrangements for Cody and himself to stay with his uncle, Charles Williams, and his wife. Father and Cody stayed at the Williams' home for approximately one week, until Father had a conflict with the family, and Williams asked him to leave. Because Father had nowhere else to take the child, Cody remained with the Williams.
 {¶ 5} When Cody arrived in Ohio, his dental problems were so severe his teeth were rotting. Cody was scheduled to have extensive dental surgery on October 5, 2004, however, Father did not keep the appointment. Father explained his failure to bring Cody for the dental surgery was the result of the hospital needing a release from a cardiologist or pediatrician prior to the surgery as Cody was diagnosed with a heart murmur and would need to be put under anesthesia for the surgery. A doctor with a Licking Memorial Pediatrics Office diagnosed Cody with failure to thrive on September 28, 2004. Cody was below the fifth percentile in height, weight, and head circumference. Cody weighed 22 pounds and was 32 inches tall. *Page 4 
 {¶ 6} Due to safety and medical concerns for Cody, the Department requested an ex-parte order of removal on October 7, 2004, which the trial court granted. On October 8, 2004, the Department filed a Complaint in Licking County Court of Common Pleas, Juvenile Division, alleging Cody was a dependent child, and the trial court issued an emergency ex-parte order, placing Cody in the temporary custody of the Department. Mother and Father entered pleas of admission to the allegation of dependency at the adjudicatory hearing on December 29, 2004. The trial court adjudicated Cody a dependent child and continued temporary custody with the Department.
 {¶ 7} Sometime in early 2005, Mother and her other children returned to Ohio. Mother contacted the Department to advise her caseworker she wished to be reunified with Cody and was interested in completing her case plan. Mother's case plan included finding and maintaining stable employment and housing; attending and completing parenting classes; submitting to drug screens; and completing a drug and alcohol evaluation and following all recommendations based on that evaluation.
 {¶ 8} Initially, Mother did well on her case plan. She completed the parenting course, and was maintaining a job and her own home. The Department began in-home visits with Mother and Cody. Because those visits went well, the Department requested and was granted extended visitation. However, after the request for extended visitation was made, Cody returned to his foster home after a weekend visit with Mother and Howell, and Mother advised the foster mother Howell had spanked Cody for stealing some candy. Cody confirmed the story, and had bruises on his bottom which appeared to corroborate the story. The Department addressed the concern with Howell in Mother's presence, but Howell denied he even spanks, and did not spank, Cody. *Page 5 
Following this discussion, Cody returned to his foster home on two more occasions with bruises, indicating "Daddy Roy" hit him. Thereafter, Mother's visits with Cody were supervised by the Department. Mother and Howell were instructed to complete the Department parenting program in order for visits to continue at their home. The Department scheduled two appointments for Mother and Howell to meet with the parenting class instructor. Neither Mother nor Howell called or showed up for either appointment. During this time period, Mother missed visits with Cody at the Department. The Department did not hear from Mother until approximately one month later when Mother called, inquiring as to the availability of the next parenting class. The Department advised Mother it had cancelled visits with Cody as the child was becoming confused and frustrated by her failure to attend the visits.
 {¶ 9} On September 1, 2006, the Department filed a Motion for Permanent Custody. The motion came on for hearing before the magistrate on November 21, 2006.
 {¶ 10} At the hearing, Eric Shaw, a caseworker, testified he became involved with the family in November, 2004. Shaw recalled the events surrounding the initial removal of Cody from his parents' care. The Department's immediate concern was Cody's physical health. The Department also had concerns about Mother's inconsistent employment and housing as well as her substance abuse and mental health issues. Cody was initially diagnosed with failure to thrive. Additionally, when the boy was placed in the Department's custody, he underwent hearing tests which indicated there was a possibility of hearing loss due to the duration and severity of the ear infection *Page 6 
Mother had left untreated. Cody also required extensive dental work as most of his teeth were rotting.
 {¶ 11} With respect to the case plan requirement Mother obtain stable employment, Shaw stated Mother did not become employed until September, 2005, working the night shift at the Newark Advocate. Shaw also noted Mother was able to schedule and attend medical appointments for her other three children, but was unable to do the same for Cody. With respect to Mother's mental health issues, Shaw testified Mother was scheduled for an intake appointment, however, a week and a half prior to the appointment, Mother returned to Nevada. Mother did not complete any counseling in Nevada. Upon her return to Ohio, Mother completed an intake appointment and three counseling sessions, but never scheduled additional appointments.
 {¶ 12} Shaw expressed concerns about Mother's ability to advocate for Cody as Mother had shown she was unable to advocate for herself during the Department's involvement. Mother did not commence parenting classes until May, 2005. Rather than completing the Department parenting program, Mother attended parenting classes through Pathways. Through discussions with the Pathways parenting instructor, Shaw learned the program was not comparable to the Department program. In order to make the Pathways program comparable, Mother was required to attend a group of classes between July 26, 2005, and August 16, 2005. Mother did not attend those classes.
 {¶ 13} Shaw expressed ongoing concerns about Mother's ability to parent Cody. Shaw recalled, on August 10, 2005, Cody was scheduled for surgery. Mother appeared 1 ½ hours late, which delayed the procedure. While Cody was in surgery, Mother and her mother took 1 ½ hour walk, which raised questions in Shaw's mind as to her *Page 7 
emotional support of Cody. Mother was also required to attend Cody's doctor's appointments. Mother did attend some appointments, however, she brought the other children to those visits. As a result, Mother focused on the other children and was unable to comprehend and digest all the information presented about Cody. Mother did not attend an informal school picnic at Cody's school in September, 2005. Mother also failed to attend the formal orientation at the school. Mother appeared so late for many visits, the visits were actually cancelled.
 {¶ 14} Shaw recounted the spanking incidents which resulted in Mother's visits becoming supervised. Cody was terminated from speech therapy after Mother failed to bring him to two visits, two weeks in a row. Mother did not understand the ramifications of her failure to contact a medical office when she needed to cancel an appointment. Overall, Shaw found Mother was not making steps to ensure Cody was protected, and failed to demonstrate a commitment to meeting Cody's medical needs. Shaw concluded granting custody to the Department would be in Cody's best interest as the child needed a stable, nurturing environment in which to grow. Mother was unable to provide such an environment.
 {¶ 15} Lanette Brewer, Cody's foster mother, testified the boy was placed with her family in November, 2004. Brewer described Cody's medical, physical, and developmental conditions when he first arrived. Brewer explained he had had two clef pallet surgeries, but still could not speak well and needed speech therapy. A number of Cody's teeth were rotted and required extraction. Cody also needed tubes in his ears. Although Cody had undergone several surgeries at the beginning of his placement with Brewer, he continued to have medical problems. Brewer explained Cody would become *Page 8 
extremely ill, vomiting for two or three days, and ultimately requiring a hospital visit due to dehydration. Initially, doctors believed Cody suffered from Celiac disease, but they subsequently learned the boy has a severe allergy to peanuts. Cody had gained some weight while in Brewer's care, however, he was still very small, weighing only 24 pounds at almost five years old.
 {¶ 16} Brewer noted because Cody was developmentally delayed, he attended a program through Flying Colors and an IEP was created. Although Cody's motor skills were relatively age appropriate, the boy had difficulty with his hand/eye coordination and ability to talk. His cognitive skills were on target. When Cody initially was placed with the Brewer's, he was extremely aggressive, but Brewer noted he had become a very caring little boy.
 {¶ 17} Brewer recalled, one day when Cody returned from an extended visit with Mother, he announced Howell had spanked "my butt really hard". Mother confirmed Howell had spanked Cody, explaining the children had food behind a chair. That evening, at bath time, Brewer observed severe bruises on Cody's bottom as well as his chest. The following weekend Cody returned to Brewer's home after an extended visit with Mother, and again advised her Howell had spanked him. Brewer found new bruises on Cody. After returning to Brewer's home with bruises the third weekend, the Department terminated Mother's visits. Brewer indicated Cody became very emotional when she informed him of an upcoming visit. Cody did not want to visit Mother while Howell was at the house. After visits were terminated, Cody calmed down and became less aggressive. *Page 9 
 {¶ 18} Recalling Cody's medical appointments, Brewer stated Mother attended some, but always brought the other children. Cody had surgery for his clef pallet, and Mother was to spend the night at the hospital with him. However, Mother decided to go home and did not stay with Cody. On a Wednesday evening, Brewer contacted Mother and advised her they were taking the boy to the emergency room as he had been vomiting for several hours. Brewer told Mother he was very ill. Mother replied she was going to bed and would call Brewer when she woke up. Mother did not call until two days later.
 {¶ 19} Brewer stated Cody calls her, "Mom", and her husband, "Dad". Cody interacts well with Brewer's three biological children as well as her other foster child. Cody is particularly close to Brewer's youngest daughter. Brewer indicated Cody has a place in her home from now until the foreseeable future, and the boy could stay with her family if permanent custody was granted. Additionally, Brewer indicated her family would consider adopting Cody.
 {¶ 20} On January 26, 2007, the Magistrate issued a Decision, recommending Mother's parental rights be terminated, and Cody be placed in the permanent custody of the Department for purposes of an adoptive placement. Mother filed objections to the magistrate's decision. Via Judgment Entry filed May 9, 2007, the trial court denied Mother's objections, and approved and adopted the magistrate's decision as order of the court.
 {¶ 21} It is from this judgment entry Mother appeals, raising the following assignment of error: *Page 10 
 {¶ 22} "I. THE TRIAL COURT'S ORDER GRANTING PERMANENT CUSTODY TO THE AGENCY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 23} This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.1(C).
 I {¶ 24} In her sole assignment of error, Mother maintains the trial court's decision to grant permanent custody of Cody to the Department was against the manifest weight of the evidence.
 {¶ 25} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. . Jeffries (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279,376 N.E.2d 578.
 {¶ 26} Furthermore, it is well-established "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In reMauzy Children (Nov. 13, 2000), Stark App. No. 2000CA00244, quoting In reAwkal (1994), 95 Ohio App.3d 309, 316, 642 N.E.2d 424.
 {¶ 27} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court *Page 11 
schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 28} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 29} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. *Page 12 
 {¶ 30} As set forth in the Statement of Facts and Case, supra, Eric Shaw, the Department caseworker assigned to the family, testified he remained concerned about Mother's ability to protect Cody and commit to his medical needs. Mother had over two years to work on her case plan. Although she started several of the requirements, she never completed many to the satisfaction of the Department. Mother failed to attend meetings regarding Cody's IEP, and was not present for a number of medical appointments. Even when Mother was physically present for these appointments, she was not cognitively present — exerting her energies on the other children. Cody's foster mother called Mother to advise her they were taking the boy to the emergency room. Mother could not be bothered to go the hospital, but rather waited two days before contacting Brewer as to Cody's well being. The record is replete with examples of Mother's lack of willingness to make this child a priority. Cody has a number of special needs and needs a stable, nurturing home environment. Brewer testified she and her family are committed to Cody, and are considering adopting him.
 {¶ 31} Based upon the foregoing and the entire record in this matter, we find the trial court's decision to grant permanent custody to the Department was not against the manifest weight of the evidence.
 {¶ 32} Mother's sole assignment of error is overruled. *Page 13 
 {¶ 33} The judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed.
 Hoffman, P.J., Gwin, J. and Edwards, J. concur. *Page 14 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to Appellant.
[1] Father is not a party to this appeal. *Page 1